**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| | : | CIVIL ACTION NO. 08-5572 (MLC) |
| IN RE ANADIGICS, INC., | : | |
| SECURITIES LITIGATION. | : | **MEMORANDUM OPINION** |
| | : | |
| | : | |
| _____ | : | |

**COOPER, District Judge**

Plaintiffs bring this putative class action against defendants, Anadigics, Inc. ("Anadigics"), Bamdad Bastani ("Bastani"), and Thomas C. Shields ("Shields" and together with Bastani, "Individual Defendants") (collectively, "Defendants"), on behalf of all buyers of Anadigics's publicly traded securities between February 12, 2008, and August 7, 2008 (the "class period"). (Dkt. entry no. 68, 2d Am. Compl. at ¶ 1.)[1]

Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §

---

[1] Although Plaintiffs style the current pleading under consideration as the "First Amended Class Action Complaint for Violations of Federal Securities Laws," they were instructed, pursuant to a Stipulation and Order entered on 8-10-10, to file a "Second Amended Complaint." (Dkt. entry no. 66, 8-10-10 Stip. & Order at 2.) Because plaintiffs have previously filed a Complaint (dkt. entry no. 1) and a Consolidated Class Action Complaint (dkt. entry no. 52) which was, for all intents and purposes, an amended complaint, we will refer to the current Complaint as the "Second Amended Complaint" insofar as it constitutes the third pleading by plaintiffs. (See dkt. entry no. 43, 9-15-09 Stip. & Order at 2 (granting leave to plaintiffs to file a "Consolidated Amended Complaint").)

78j(b), and Securities Exchange Commission Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5.  (Id. at ¶¶ 202-211, 214-221.) Plaintiffs also allege that the Individual Defendants violated Section 20(b) of the 1934 Act, 15 U.S.C. § 78t(a), as control persons of Anadigics.  (2d Am. Compl. at ¶¶ 223-225.)  The Second Amended Complaint alleges that Defendants misled investors about Anadigics's capability to meet demand for its products.

Defendants move to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Section 78u-4 et seq.  (Dkt. entry no. 69, Mot. to Dismiss.) Plaintiffs cross-move to strike the Appendices submitted by Defendants in support of Defendants' motions to dismiss the Consolidated Class Action Complaint and the Second Amended Complaint, as well as certain exhibits attached to the affidavits of Robert A. Alessi dated December 3, 2010, and December 23, 2009.  (Dkt. entry no. 71, Cross Mot. to Strike; dkt. entry no. 69, Defs. Br., App'x A (discussing 15 sets of Anadigics statements identified in the Second Amended Complaint as "Defendants' Materially False and Misleading Statements and Omissions"); dkt. entry no. 69, 12-3-10 Alessi Aff.; dkt. entry no. 54, 12-23-09 Alessi Aff.)  For the reasons stated herein, the Court will grant the motion and deny the cross motion.

**BACKGROUND**

**A.    Anadigics's Business**

Anadigics designs and manufactures radio frequency integrated circuits, primarily using gallium arsenide semiconductor materials, for the wireless broadband and cable infrastructure markets.  (2d Am. Compl. at ¶ 2.)  Its main products are power amplifier modules, which are used in wireless handsets, WiFi routers for computers, and cable set-top boxes. (Id.)  During the class period, Bastani served as Anadigics's President, Chief Executive Officer, and a director, and Shields served as Anadigics's Chief Financial Officer and Executive Vice President. (Id. at ¶¶ 27-28.)

**1.    Demand Increase and Manufacturing Capacity "Ramp-Up"**

Anadigics's manufacturing operations took place in its Warren, New Jersey, fabrication facility (the "fab").  (Id. at ¶ 2.)  Demand for Anadigics's products increased in early 2007, as the wireless handset industry began to transition from second-generation cell phones to third-generation ("3G") technology utilizing compound (as opposed to silicon) semiconductor chips such as those manufactured by Anadigics.  (Id. at ¶ 8.)  In an effort to meet rising customer demand, Anadigics began to "ramp up" its manufacturing capacity to increase production.  The "ramp up" process involved both increasing production at the Warren

3

fab, which was allegedly not operating at its full capacity, as well as construction of a new fab in China.  (Id. at ¶¶ 8, 63-64, 67-69.)  The "ramp up" process was initially hindered by the lack of a key manufacturing tool, a "via etcher."  (Id. at ¶ 9.) Additional via etchers were not ordered until January 2008, with a delivery time of approximately six months, such that production at the fab was constrained by the limited number of via etchers then on hand (the "via etcher problem").  (Id.)

The Second Amended Complaint alleges a situation in which Anadigics was unable to meet increasing demand for its products, to which customers responded by "dual sourcing" or "double ordering" products, meaning such customers would simultaneously place identical orders with both Anadigics and a competitor in hopes of receiving the products from one of them in a timely fashion.  (Id. at ¶¶ 12-13, 81, 101.)  Customers also allegedly engaged in "over-ordering" when Anadigics was unable to fill orders completely, in hopes of getting a larger proportion of available inventory.  (Id. at ¶¶ 15, 106.)  Plaintiffs claim that Defendants were aware of this situation, yet continued to assure the market that Anadigics was poised to capitalize on the increased demand for its products and would continue to gain market share vis-a-vis its competitors.  (Id. at ¶ 16.)

## 2.   The Intel Yield Problem

At the beginning of 2008, Anadigics employees discovered a yield problem with respect to wireless devices it was manufacturing for Intel, allegedly one of Anadigics's most important customers:  as many as 50% of the devices were failing in late-stage testing, rather than the anticipated failure rate of 10% (the "Intel yield problem").  (Id. at ¶ 10.)  Because of the 16-week lead time required for the manufacturing process, this yield problem led to a failure to ship the devices to Intel on time, and Anadigics diverted manufacturing capacity to Intel orders at the expense of other customers.  (Id. at ¶¶ 10-11.)  This allegedly caused Anadigics to "short" the orders of other important customers, including LG Electronics Inc. ("LG") and Samsung Electronics Co. ("Samsung").  (Id. at ¶¶ 11, 49, 66.)  LG and Samsung allegedly began dual sourcing in the first quarter of 2008, whereas prior to that, both had used Anadigics as their sole source.  (Id. at ¶ 99.)  Plaintiffs complain that even though Defendants were aware of their manufacturing capacity problems, Bastani "repeatedly told customers that Anadigics would be able to fill their orders even when production managers told him there was simply not enough capacity in the fab, given the lack of via etchers and the diversion of capacity to Intel," to support such commitments.  (Id. at ¶ 14.)  Eventually, even these

5

assurances did not suffice to retain existing customers after Anadigics failed to fill firm orders on time, and Anadigics lost market share to its competitors by the end of 2008. (<u>Id.</u> at ¶¶ 108-114.)

### B.   The Allegedly Fraudulent or Misleading Statements

#### 1.   February 12, 2008 Press Release

The class period relevant to this action began on February 12, 2008, when Anadigics issued a press release touting the growth in demand from its wireless customers and its ability to meet that increased demand. (<u>Id.</u> at ¶ 116.)  In that press release, Bastani stated that Anadigics was "working to build further market share with [its] top-tier customers" and "we continue to improve our manufacturing efficiencies and our production capacity plans continue to progress through equipment expansion in our New Jersey fab, qualifying external foundries and building our next fab in China." (<u>Id.</u>; 12-23-09 Alessi Aff., Ex. 23, 2-12-08 Press Release.)  The February 12, 2008 Press Release contains the following cautionary language:  "The statements regarding outlook are forward looking and actual results may differ materially.  Please see safe harbor statement at the end of the press release." (2-12-08 Press Release at 2.)[2]

---

[2] The "Safe Harbor Statement" advises:

Except for historical information contained herein, this press release contains projections and other forward-looking statements

Plaintiffs allege that this statement was false and misleading because Bastani allegedly had been informed that Anadigics's most important wireless handset customers were dual sourcing and, as a result, Anadigics was losing market share. (2d Am. Compl. at ¶ 117.)

### 2. February 12, 2008 Earnings Call

Bastani conducted an earnings call, also on February 12, 2008, to discuss the fourth quarter of 2007, in which he allegedly misleadingly denied that Anadigics's customers were over-ordering product.  The transcript of that earnings call shows the following exchange:

> John Pitzer [Credit Analyst, Credit Suisse] – Concept[u]ally whenever a key supplier's capacity constrained customers often times order more than they

---

(as that term is defined in the Securities Exchange Act of 1934, as amended).  These projections and forward-looking statements reflect the Company's current views with respect to future events and financial performance and can generally be identified as such because the context of the statement will include words such as "believe," "anticipate," "expect," or words of similar import. Similarly, statements that describe our future plans, objectives, estimates or goals are forward-looking statements.  No assurances can be given, however, that these events will occur or that these projections will be achieved and actual results and developments could differ materially from those projected as a result of certain factors.  Important factors that could cause actual results and developments to be materially different from those expressed or implied by such projections and forward-looking statements include those factors detailed from time to time in our reports filed with the Securities and Exchange Commission, including the Company's Annual Report on Form 10-K for the year ended December 31, 2006, and those discussed elsewhere herein.

(2-12-08 Press Release at 2.)

need in hopes of getting what they can.  How do you manage against that risk?  And I guess at what point do you feel your capacity growth starts to meet the expected demand curve that we have to worry about, maybe the demand curve being overheated because of tight capacity?

Bami Bastani - Let me answer that from one or two different angles.  In terms of over ordering in our interactions with our customers, we believe they are running very lean in their channels too, in a sense that we have very tight communication between us and between them on [] adjusting time deliveries.  So, I do not see where we are today, any of them have over ordered.  And now, in terms of would there be a possibility as they look at Q1 or Q2, they would like to build some buffer inventories, they might.  And I'm sure they would like to.  But again, we have kind of [engaged] our capacity growth to the point that we know what they want and what we can serve and we work very close hand-in-glove with them to meet their demand.  At this point in time, based on the visibility I have, I do not see that as an issue.

(Id. at ¶ 18; 12-23-09 Alessi Aff., Ex. 24, 2-12-08 CallStreet

Tr. at 18-19; accord dkt. entry no. 72, Gardner Decl., Ex. A, 2-

12-08 Thomson Tr. at 24-25.)[3]  Bastani also made statements

---

[3] Defendants' motion cites transcripts of earnings calls that were prepared by CallStreet, whereas Plaintiffs rely on alternative transcripts published by Thomson StreetEvents for purposes of both the Second Amended Complaint and their opposition to Defendants' motion to dismiss.  (See dkt. entry no. 72, Pls. Opp'n at 26 n.16; id., Gardner Decl., Exs. A-D (Thomson transcripts of earnings calls dated 2-12-08, 4-22-08, 7-22-08, and 8-8-08).)  In setting forth the allegations in the Second Amended Complaint, the Court has attempted to provide citations to both versions of the relevant transcript, because the Court has expanded upon some of the statements contained in the Second Amended Complaint in order to adhere to the rule of completeness. See Fed.R.Evid. 106.  Where the transcripts differ or the cited transcript contains obvious incongruities or transcription errors, the Court has provided the alternative transcription in brackets.

addressing Anadigics's efforts to increase manufacturing

capacity:

> We will continue to work directly with our customers on
> meeting their increased demands for our products and
> while we continue to operate with very lean inventory
> levels in finished goods, our increased production
> capacity plans continue to progress forward through
> continuous improvement in manufacturing efficiencies,
> operations of staffing, additions, and equipment
> expansions in New Jersey fab as well as engaging
> qualifying external foundries and building our next fab
> in China.

(2d Am. Compl. at ¶ 120; 2-12-08 CallStreet Tr. at 5; accord 2-

12-08 Thomson Tr. at 4.)

Plaintiffs allege that Bastani's statements in response to

the question about over-ordering were false and misleading

because Bastani knew about the constraints on capacity imposed by

the lack of via etchers, had diverted capacity to filling Intel

orders at the expense of other customers, and was aware that

wireless handset customers had begun dual sourcing due to

Anadigics's failure to fill firm orders on time.  (2d Am. Compl.

at ¶ 119.)  Plaintiffs argue that the statement about "increased

production plans" was misleading because Bastani knew at the time

of that statement that the fab was operating at maximum possible

capacity.  (Id. at ¶ 121.)

Plaintiffs also allege that the Individual Defendants made

material omissions during the February 12, 2008 Earnings Call

when asked directly about the Intel yield problem, by failing to inform the market that the diversion of production capacity to Intel was causing Anadigics to miss orders for its wireless handset customers and, in turn, causing those wireless handset customers to dual source:

> John Lau [Analyst, Jeffries and Company] - And, okay, none of that implies any yield problems.  So I guess we are, you are pretty comfortable with your yield progress in the product lines?
>
> Thomas Shields - John, this is Tom.  To your point and a reference made earlier was that we believe we're one of the best relative to our manufacturing operations and yield.  So it's not a material number relative to the total gross margin.  Relative to the gross margin that we're talking about is you hit the relative items that are causing the change from Q4 to Q1.
>
> John Lau - Great.  And then the final point is that a lot of concerns with regards to the Intel business that you have and Bami had indicated that your relationships are very good and that your visibility continues to improve with work on them.  Do you believe - I know it's hard to give full, very detailed guidance, but Bami and Tom, do you believe your Intel business will grow year-over-year in that area? . . . [D]o you have enough visibility into the design shift to know that yet?
>
> Bami Bastani - It just falls along the conversation that, or the comments that Tom made, John that we are not giving annual or beyond Q1 guidance.  However, in my prepared remarks I made a comment that looking into the business as it shapes up into Q2 wireless LAN is absolutely one of the strengths.

(Id. at ¶ 125; 2-12-08 CallStreet Tr. at 12; 2-12-08 Thomson Tr. at 14.)

### 3. February 29, 2008 Form 10-K

Anadigics filed its Form 10-K for fiscal year 2007 on February 29, 2008.  (12-23-09 Alessi Aff., Ex. 25, 2-29-08 Form 10-K.)  Plaintiffs allege that the Individual Defendants "misleadingly omitted to inform the market" in the 2-29-08 Form 10-K that the "ramp up" had been delayed due to the fab's lack of via etchers, and the fact that production could not be increased until such via etchers were delivered and installed in summer 2008.  (2d Am. Compl. at ¶¶ 128-129.)  Plaintiffs identify the following statement as false or misleading:

> At December 31, 2007, the Company had unconditional purchase obligations of approximately $20.3 million, of which $17.6 million relates to capital equipment purchase requirements primarily over the first half of 2008.  Such capital purchase requirements will serve to increase the installed equipment capacity of the Company's manufacturing operations in response to increases in customer demand for the Company's products.

(2-29-08 Form 10-K at 25.)

### 4. April 22, 2008 Earnings Call

Defendants conducted an earnings call to discuss the first quarter of 2008 on April 22, 2008.  Plaintiffs allege that the Individual Defendants "misleadingly touted the Company's ability to meet their customers' demand while omitting information about

the fab's equipment constraints," specifically (1) the via etcher problem and (2) the Intel yield problem.  (2d Am. Compl. at ¶ 130; 12-23-09 Alessi Aff., Ex. 27, 4-22-08 CallStreet Tr. at 9.) The 4-22-08 Earnings Call stated in relevant part:

> George Iwanyc [Analyst, Oppenheimer & Co.] - At this point are you meeting full customer demand[?] [A]re you still constrained in some cases?
>
> Bami Bastani - Given that - one of the things I talked about is we've had a lot of high level relationship discussions with our customer.  So basically we have matched our expectations and their expectation.  And part of that is of course driving gross margin and driving high-end phones.  So [where] we care, answer is yes, we are perfectly aligned.  Where there is low end phone for some developing market, we have basically said given those to our competitors.  So we have been aligning our strategies very well with our partners and our customers and they are being happy and now we are happy.

(4-22-08 CallStreet Tr. at 9; Gardner Decl., Ex. B, 4-22-08 Thomson Tr. at 10.)  Plaintiffs allege that Bastani's response to this question was "materially false and misleading" because Bastani knew at the time that "Anadigics had lost all credibility with its wireless handset customers" and, contrary to Bastani's assertions, customers were dual sourcing their orders as opposed to being "perfectly aligned" and happy with Anadigics.  (2d Am. Compl. at ¶ 131.)

   During the same earnings call, Bastani allegedly denied that Anadigics had lost business from Samsung:

Aalok Shah [Analyst, D.A. Davidson & Co.] - [O]ne
specific competitor has been talking about taking some
shares of Samsung because the current [incumbent]
doesn't have the full suite of products for [a] front
end module.  My guess is they're referring to you, can
you give me a sense Bami what they are talking about,
number one?

Bastani - Yeah, let me just answer the first concern
that you raised, frankly I don't believe I am losing
anything to anybody, there is just so much demand out
there, there is plenty to go around for everybody.  I
hope everybody gets a piece of it.  Certainly, as you
can see from our growth we are riding the wave in a
very strong way. . . . So today we are getting more
than our fair share of whatever we produce today.

. . . [9 pages later]

Bastani [closing remarks] - [F]or those of you who
follow us and there has been relentless rumors left and
right about market share gain and loss and things like
that [by] our peers, [by] our competitors, but some
analysts have faith in us [and] I don't know of any
company that has delivered 12 consecutive quarters of
growth that is market share and have guided to the
13th, [there is ] a competitiveness in our DNA.  Our
leadership is validated by the success of our products,
our strong financial performance and our Q2 guidance
momentum as we work towards delighting our customers
and creating value for our shareholders.  Thank you
very much.

(4-22-08 CallStreet Tr. at 10, 19.)  Plaintiffs allege that these

statements by Bastani were false and misleading because "Bastani

knew that Samsung had downgraded Anadigics to a 'D' rating,

meaning that it had internally decided to stop using Anadigics as

a supplier, and was sourcing from [Anadigics's] competitors."

(2d Am. Compl. at ¶ 133.)

Shields also participated in the April 22, 2008 Earnings

Call.  Plaintiffs highlight the following passage:

> Thomas Shields - This is Tom.  I would just add that
> the revenue that we reported was very important in the
> eyes of our customers.  Because it actually
> demonstrated that yeah we may have had issues where we
> – haven't had finished goods at the start of the
> quarter. [What it basically tells you is] that cycle
> time is improving and really gaining the confidence of
> the customers relative to the shipments going forward.
> . . . Obviously just look at our customer base today
> and we've also been discussing and while we haven't any
> press release to comment on relative to additional
> customers and wireless stage – we've been growing
> relative share with our customers.  So as we look at
> the perhaps the platform to be shifting [shipped in]
> the second half is [an] opportunity for us to continue
> to gain share.

(2d Am. Compl. at ¶ 134; 4-22-08 CallStreet Tr. at 14; 4-22-08

Thomson Tr. at 16.)  Plaintiffs allege Shields's statement was

false and misleading because he allegedly knew that wireless

handset customers were resorting to dual sourcing from

Anadigics's competitors, and Anadigics was losing market share as

a result.  (2d Am. Compl. at ¶ 135.)

### 5.   July 22, 2008 Press Release

Anadigics issued a press release on July 22, 2008,

announcing its second quarter 2008 results and stating that

"[t]he low end of the net sales guidance [range of $75.0 million

to $81.0 million] reflects softness in industry demand and
inventory re-balancing that may occur in the third quarter 2008
from our Wireless customers." (2d Am. Compl. at ¶ 144; 12-23-09
Alessi Aff., Ex. 30, 7-22-08 Press Release at 1.) The 7-22-08
Press Release also quotes Bastani as saying:

> As we enter the third quarter 2008, Broadband will
> continue to have strong momentum, which will partially
> offset an expected decline in Wireless as certain of
> our customers have lowered their demand expectations
> and are reducing inventory levels. However, we believe
> this to be temporary as design-in activity has
> increased and therefore, are aggressively pursuing our
> capacity expansion plans in China to meet future
> demand.

(Id.) Plaintiffs allege that this statement was materially false
and misleading because Bastani allegedly knew that the decreased
demand was a direct result of Anadigics's inability to fill its
wireless handset customers' firm orders and concomitant loss in
market share. (2d Am. Compl. at ¶ 145.) Plaintiffs also claim
Bastani misleadingly failed to disclose to the market that
Anadigics's inability to fill orders was due to (1) lack of via
etchers at the fab, and (2) diversion of manufacturing capacity
to resolve the Intel yield problem. (Id.)

### 6.   July 22, 2008 Earnings Call

Plaintiffs allege that during a July 22, 2008 earnings call,
Bastani "continued to falsely attribute the drop in wireless
handset demand as excess inventory on the part of the Company's

customers," and failed to acknowledge that the real reason for declining demand was allegedly loss of market share:

> Bami Bastani - Back to our business outlook, we are seeing strength in broadband and some softness in wireless sector as we enter[] the second half of '08. At present we believe the softness in wireless is more [of a Q3] phenomenon as customers have been building up inventory in the channel and in critical components such as PAs.
>
> . . . [several pages later]
>
> John Lau - Then finally just as a follow-up, I think that we'll clarify the wireless commentary that you had[,] you mentioned the weakness that you had.  Bami, if you can kind of put it in a different way, how much of that wireless weakness that you're seeing in Q3 is more related to the end-market versus an inventory correction at a specific vendor?
>
> Bami Bastani - John, I can't quantify the two but I know, for example in China we have both of it going . . .
>
> John Lau - I see.
>
> Bami Bastani - . . . and on the other side in Korea it is more of a market correction.
>
> John Lau - Okay.  So there is a [factor] of both in there and it is not a market share loss issue, but just a combination of the inventory correction and the overall macro?
>
> Bami Bastani - The answers, those are the primary.  We did turn over some socket to competitors because we just couldn't fill the prescription, right?  But we are engaged in every design that goes on right now.  So, that is why for us having that capacity is critical.

16

> I mean that the number one thing that people ask is -
> we are investing to reap the benefits of our strong
> market position.  If we didn't have a strong market
> position, we wouldn't be investing.

(2d Am. Compl. at ¶ 146; 12-23-09 Alessi Aff., Ex. 31, 7-22-08

CallStreet Tr. at 4, 11-12; Gardner Decl., Ex. C, 7-22-08 Thomson

Tr. at 4, 15.)

Plaintiffs contend that Bastani's statements during the 7-22-08 earnings call were false and misleading because he knew that decreased demand by wireless handset customers was not due to "inventory correction" or "macro" economic conditions, but rather because of the dual sourcing and loss of market share. (2d Am. Compl. at ¶ 147.)

Plaintiffs also point to the following statement by Bastani as being false and misleading for the same reasons:

> George Iwanyc - [That] softness you are seeing.  Can
> you give us an idea of how widespread is it? Is it
> across the customer base or is that one or two
> customers that you are seeing the weakness at?
>
> Bami Bastani - The weakness[es] we have seen are no
> different than what has already been talked in the
> industry, one of the large Korean customers, for
> example, is cutting inventory in half, the other one
> already announced a phenomenal Q2 and guided to Q3.  We
> see some weakness also in China customers.  So I think
> that none of them are out of the order rate that has
> already not been announced the marketplace by the
> analysts before.
>
> George Iwanyc - Okay.  And what signs do you see that
> gives you confidence that the trends are temporary?

17

> Bami Bastani - If I look at our fourth-quarter backlog,
> quarter to date for fourth quarter, we are running
> stronger than last year, quarter to date, on the
> wireless backlog.  So I think what is happening, that
> is [my] personal view, or our view, in a sense that
> these things kick in in September, October timeframe
> generally.  And we are all going to wait and see to see
> what is the shape of that in terms of the preparation
> for fourth quarter, which third quarter – which
> September – is [the] beneficiary.  On the other side we
> see a lot of designing activities for our products, so
> we are very highly engaged with our existing customers
> plus some new ones as we mentioned.  So the designing
> activity plus the stuff that is already pre-positioned
> itself in the fourth quarter gives us that confidence.

(2d Am. Compl. at ¶ 148; 7-22-08 CallStreet Tr. at 5; Gardner

Decl., 7-22-08 Thomson Tr. at 4-5.)  Plaintiffs further allege

that on the same earnings call, Shields also falsely stated that

the drop in demand was due to a customer "inventory issue," as

opposed to loss of market share:

> Edward Snyder [analyst] - . . . [W]hen you go back to
> your customers and say, look your forecasts are one
> thing, your order books are another, what do they tell
> you, why did they see it as a slowdown now and why did
> – do you think it is going to be temporary?
>
> Thomas Shields - Well, first of all, I just look at
> Samsung and Samsung has said that they still envision
> doing 200 million units for the year, while they may
> have been down from Q1 to Q2 and they're still probably
> suggesting [200 million], or if not better.  So unless
> they come back to the Street and tell the folks that it
> is going to be less than 200 [million], the[re's]
> reason to believe that - based upon our share - that we
> should be a recipient of some nice growth.

So there are certain indications at least that when we
sit down with customers that could call for better
performance.  Now obviously we are cautious just like
the next guy because sometimes [things do] take one
[or] two quarters to correct itself.  So, yes, in fact
it is at really an inventory rebalancing as one
customer has indicated, yes, therefore does that mean
then you lose a temporary inventory bill for [a]
certain month, however we know we're entering the
holiday trade season.

So the question is they are probably looking at the
market from a consumer side and say hey, what's the
market going to look like? So we believe that it's
going to be – maybe it is not a September p[u]ll maybe
becomes a[] very strong October, that's the question
mark.  So I think the direct correspondence relative
[to] what the customer is suggesting then also hinting
the same time relative to certainly some weaknesses
that may occur.  But on the surface we are following
the market.

(2d Am. Compl. at ¶ 150; 7-22-08 CallStreet Tr. at 6; 7-22-08

Thomson Tr. at 6.)

Plaintiffs further point to statements by the Individual

Defendants regarding Anadigics's capacity to meet demand as false

and misleading due to their failure to acknowledge that the

additional via etchers would not be delivered and brought online

until September 2008 at the earliest:

Bami Bastani - On the other side, Ed, as we experienced
last year when these guys turn on a dime, they turn on
a dime, so you better be prepared serving them.  So you
cannot go cautious on your ability to serve them.

Edward Snyder - This is why you are continuing with it?

19

Bami Bastani - Exactly.

Edward Snyder - Obviously a long-term forecast is still very robust and Nokia did talk pretty positively about the overall demand for the industry this year from a guidance [standpoint] and you are expecting it's going to snap back just as quick once you had this -

Bami Bastani - So you have to be ready.

Edward Snyder - Okay.

Thomas Shields - And we made our commitment to our customers to do that.

Edward Snyder - Say that again, I'm sorry Tom?

Thomas Shields - We made the commitment to make sure that we are going to be there when that demand surge potentially happens.

(2d Am. Compl. at ¶¶ 152-153; 7-22-08 CallStreet Tr. at 7; 7-22-08 Thomson Tr. at 7.)

Plaintiffs allege that Bastani also falsely stated during the July 22, 2008 earnings call that Anadigics's supply problems were a problem of the past, omitting to inform the market that the fab would continue to be constrained through summer 2008:

Aalok Shah [Analyst, D.A. Davidson & Co.] - . . . Bami, you mentioned that you just don't have the capacity to meet some of the demand out there.  Is that all on the 3G side of things right now?  Or is that some other legacy as well?

Bami Bastani - Well that was a comment about the past. That was like a Q4 [2007], Q1 [2008] comment.  We have shipped a lot of the stuff.

20

(2d Am. Compl. at ¶¶ 154-155; 7-22-08 CallStreet Tr. at 12; 7-22-08 Thomson Tr. at 16.)

The final statements alleged by Plaintiffs to be false or misleading were made by Bastani (1) to analyst John Pitzer, and (2) to conclude the call:

> John Pitzer - . . . Thanks for taking my questions - a lot of them have been answered.  But I guess to the extent that you guys have been managing a fairly tight capacity situation over the last couple of quarters, can you help me understand that, how that progressed through the June quarter, whether it would be customers and allocation, lead times to customers, your ability to compete for incremental design sockets?
>
> Bami Bastani - Yeah, in Q2, demand and supply were pretty much in balance.  So it is where I like to put it.  We saw the - areas that we saw a lot of pull-ins was primarily in the broadband area.  And it included WiFi, it included FiOS, it included DOCSIS 3.0, so a lot of it was new products and then new things coming to market, and then we saw pull-ins extend that it was within our lead time, of course, we served them to the extent that - it still takes about 10 to 12 weeks to get thin[g]s out of [fab] and into the assembly and testing [and] ship[ped] to customers.  And to an extent that it wasn't within the 10 to 12 week lead time, we had to [start] Q3.  So - but broadband across-the-board was, the story was more pull-in oriented than anything it has been in the past year.
>
> John Pitzer - Just to be clear[,] to the extent that one of the concerns has been your lack of supply kind of opening the door for incremental competition.  You don't think that was the case in the June quarter.  You think, your supply got up to demand?
>
> Bami Bastani - Yes, yes.

. . .

> Bami Bastani [to conclude earnings call after
> conclusion of questions] - So let me recap by saying
> broadband is robust and growing sequentially and
> literally in all fronts.  Wireless is sequentially
> down.  We believe that's primarily due to softness in
> the market and some inventory correction at customers.
> Our relationships are very strong.  This includes
> QUALCOMM, Intel, Motorola, Cisco.  We have brought new
> customers [] such as RIM, and [a] good set of ODMs.  We
> are investing in the future.  We have a positive long-
> term outlook and we'd like to invest to reap the
> benefits of our strong market position.  And that
> reflects in our China build-out plan that we discussed
> in very [great] detail today.  Thank you very much for
> being with us.

(2d Am. Compl. at ¶ 156; 7-22-08 CallStreet Tr. at 16-17, 18; 7-22-08 Thomson Tr. at 22-24.)  Plaintiffs allege that these statements were false and misleading insofar as they omitted that customers were dual sourcing, and Samsung had allegedly "by April 2008, given Anadigics a 'D' rating and was no longer using the Company as a supplier."  (2d Am. Compl. at ¶ 157.)

### C.   Post-Class Period Allegations

The class period proposed by Plaintiffs ended August 7, 2008.  Plaintiffs allege that on that date, Anadigics issued a press release lowering third quarter 2008 financial guidance due to "a decrease in product demand from its wireless handset customers" and announcing that the planned acceleration of capital investment in the China fab would be delayed.  (2d Am.

22

Compl. at ¶ 165; 12-23-09 Alessi Aff., Ex. 37, 8-7-08 Press Release.)  This press release was followed on August 8, 2008, by an analyst call, during which Bastani announced that demand for Anadigics's products had decreased in the wireless handset market because many customers were "carrying more inventory than we thought," which Bastani stated "may be attributed to over-ordering to build buffer inventory and/or some share loss."  (12-23-09 Alessi Aff., Ex. 38, 8-8-08 CallStreet Tr. at 1; Gardner Decl., Ex. D, 8-8-08 Thomson Tr. at 2; see also 2d Am. Compl. at ¶ 166.)  Bastani acknowledged during this call that dual sourcing had occurred in the first and second quarters of 2008:

> Cameron Wright [Analyst, J. Fishman Limited] - Did you verify the numbers your customers are giving you at all or didn't they just . . . [not] show up as expected[?]  I don't quite understand what happened between not expecting double ordering to happen, you didn't expect it two quarters ago and now . . . if I go back to your Q4 revenue you're talking, it was at 15% of that, was it all double orders, I mean[?]
>
> Bami Bastani - No, Q4 revenue, everything was consumed in Q4.
>
> Cameron Wright - So the double ordering came from Q1, Q2?
>
> Bami Bastani - Probably in that timeframe.
>
> Cameron Wright - Probably in that timeframe.  So that's - if it was all Q1, it would have been 20% of your Q1 revenue is double ordering?

> Bami Bastani - It's hard to quantify because it's not
> the information that is line-by-line shared with
> [Anadigics].

(2d Am. Compl. at ¶ 167; 8-8-08 CallStreet Tr. at 15; 8-8-08

Thomson Tr. at 23.)

The day after Anadigics announced its revised guidance for

third quarter 2008, its stock price fell 38%.  (Id. at ¶ 174.)

Anadigics announced Bastani's resignation on August 18, 2008.

(Id. at ¶ 175.)

### D.   Parties' Contentions

Defendants argue in support of their motion to dismiss the

Second Amended Complaint that it fails to state a claim for

securities fraud because (1) it does not allege particularized

facts that the alleged statements were false or misleading when

made, (2) the market was on notice of the high demand for

Anadigics's products and the fact that Anadigics had placed its

customers on allocation, (3) Plaintiffs engage in tautological

reasoning, specifically, that the Defendants should be held

liable for securities fraud for failing to disclose what the

Defendants characterize as unsupported, conclusory allegations

regarding dual sourcing, over-ordering, and manufacturing

capacity, (4) the statements of confidential witnesses ("CWs")

relied upon by Plaintiffs lack personal knowledge, are

conclusory, and cannot be used to support an inference of

scienter, (5) the alleged statements are immaterial as a matter of law as non-actionable puffery or forward-looking statements subject to the PSLRA's safe harbor provision and the Bespeaks Caution Doctrine, and (6) the Second Amended Complaint fails to plead loss causation.  (Defs. Br. at 3.)[4]  Insofar as Defendants conclude the Second Amended Complaint does not adequately allege violations of Section 10(b), they contend Plaintiffs' claims brought under Rule 10b-5(a), Rule 10b-5(c), and Section 20(a) also fail.  (Defs. Br. at 3, 79-80, 82.)  Defendants urge the Court to dismiss the Second Amended Complaint with prejudice because Plaintiffs have been afforded an opportunity to cure deficiencies.  (Id. at 3, 82-83.)

Plaintiffs contend that Defendants make factual arguments inappropriate at the motion to dismiss stage.  (Pls. Opp'n at 3.) Plaintiffs further argue that Defendants' allegedly false and misleading statements do not fall within the PSLRA's safe harbor provision by virtue of "tangential references to the future." (Id. at 4.)  Finally, Plaintiffs contend that Defendants "cannot

---

[4] The "Bespeaks Caution" doctrine provided the standard for evaluating allegedly "meaningful cautionary language" prior to the enactment of the PSLRA and its safe harbor provision in 1995. See Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc., 720 F.Supp.2d 517, 533 n.14 (D.N.J. 2010).  Insofar as the PSLRA provides the broader protection for such language, and the PSLRA applies to this case, we do not address the Bespeaks Caution doctrine, except to note that pre-PSLRA case law may address it, and the Third Circuit Court of Appeals has thus incorporated much of the doctrine into its analysis of the PSLRA.  Id. at 533-34.

plausibly contend they remained ignorant of production capacity
and their deteriorating relationships with key wireless handset
customers," and that the CWs' statements support the inference of
scienter.  (<u>Id.</u>)

    **E.   Procedural History**

    The Court heard oral argument on Defendants' motion to
dismiss the Consolidated Class Action Complaint on August 3,
2010.  (Dkt. entry no. 67, 8-3-10 Hr'g Tr.)  The Court denied the
motion to dismiss without prejudice, but instructed Plaintiffs to
file an amended pleading to cure deficiencies noted by the Court
during oral argument.  (Dkt. entry no. 65, 8-3-10 Order.)  At the
August 3, 2010 hearing, the Court observed of the Consolidated
Class Action Complaint:

> I find this complaint to be at once cumbersome and yet
> insufficient.  It's cumbersome because it contains a
> tremendous amount of repetition of the same words over
> and over again; the formulaic recitation of whatever
> was allegedly untrue or materially omitted, with no
> detail . . . about what the actual underlying factual
> situation was.
>
> Now, I have sat here with you through this whole oral
> argument, and what I get out of it is that according to
> the plaintiff what was really wrong . . . here is that
> this company had a very severe problem filling customer
> orders . . . as they came in. . . .
>
> I do not believe that a court could ever find that just
> because the potential demand out in the market was
> greater than the production capacity of a given
> supplier, that could somehow amount to securities fraud

when the supplier said, yes, we want to get a bigger
ability to make more widgets and sell more widgets into
the marketplace.

And here, this company, throughout this so-called class
period, is saying there's a huge market out there, it's
exploding.  We want to take advantage of as much of it
as we can to sell our product into that high demand
market.  And we're gearing up, as fast as we can, our
production capacity.

I can't see how their failure to gear up fast enough or
effectively enough to attract additional orders . . .
could possibly constitute securities fraud by saying
we're – you know, we're gearing up but we have
production capability limitations that we're growing
ourselves to be bigger so as to overcome.

If that's all this case is, then it's not a case.  On
the other hand, if the internal situation with the
company was a disaster in the sense that it was
constantly overbidding what it could deliver to its
customers and then disappointing the customer who had
ordered from them and gradually driving the customers
away by inability to meet existing orders, as
distinguished from potential market demand, then maybe,
maybe there's something that this company isn't stating
fully and fairly to the marketplace in terms of its own
problems with its own customers.

(8-3-10 Hr'g Tr. at 98:4-99:23.)  The Court further observed that

Anadigics's practice of allocating available inventory to

customers had been disclosed to the market and could not be used

to support a claim for securities fraud, and instructed the

parties that Plaintiffs would have to show "something going on in

terms of this company's relationships with the customers who were

ordering from them and who were being disappointed in their

business relationship" with Anadigics.  (8-3-10 Hr'g Tr. at 99:24-100:8.)

Plaintiffs filed their amended pleading, referred to herein as the Second Amended Complaint, on October 4, 2010.  Defendants then moved to dismiss the Second Amended Complaint, as contemplated by the Court's August 3, 2010 Order.  (8-3-10 Order at 2.)  Plaintiffs moved to strike the Appendix to Defendants' moving brief, as well as certain exhibits attached to the 12-23-09 Alessi Affidavit and the 12-3-10 Alessi Affidavit, on the basis that those documents (1) constitute an improper attempt to subvert the ninety-page briefing limit agreed to by the parties and ordered by the Court, (2) improperly attempt to contradict the alleged falsity of the statements at issue, and (3) for the most part, are not referred to or relied upon in the Second Amended Complaint.  (Pls. Br. Supp. Cross Mot. Strike at 1-2.)

We find Plaintiffs' cross motion to strike procedurally improper.  While the cross motion to strike does not specify a procedural basis for the relief sought, Rule 12(f) permits a party to move to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f).  The documents at issue in the cross motion to strike do not constitute "pleadings," and thus will not be stricken pursuant to Rule 12(f).  See In re Schering-Plough

28

Corp./Enhance Sec. Litig., No. 08-397, 2009 1410961, at *2
(D.N.J. May 19, 2009) ("[B]ecause Plaintiffs attempt to strike
declaration exhibits attached to Defendants' motions, rather than
parts to a pleading, Plaintiffs' motion is procedurally incorrect
and should be denied.").

We reject Plaintiffs' contention that the documents at issue
constitute an attempt to avoid the constraints of page limits as
having no basis in the record.  (See dkt. entry no. 59, 2-4-10
Stip. & Order (granting Defendants permission to file a moving
brief not exceeding ninety pages, "excluding any exhibits or
appendices"); dkt. entry no. 53, 12-10-09 Thurman Letter; dkt.
entry no. 57, 2-1-10 DePalma Letter; dkt. entry no. 66, 8-10-10
Stip. & Order at ¶ 3 (referencing 12-10-09 Thurman Letter).)  The
Court advised the parties at the August 3, 2010 oral argument
that it would "look at the entire body of documentation for the
rule of completeness so that [the Court] can see in context
whether the items that are alleged to be false or materially
silent or misleading are actionable."  (8-3-10 Hr'g Tr. at 101:7-
11.)

The Court will therefore deny the cross motion to strike,
but apply the applicable legal standards in determining which
documents to consider in the context of the pending motion to
dismiss.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551

U.S. 308, 322-23 (2007) (stating that when faced with motion to dismiss a Section 10(b) action, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425-26 (3d Cir. 1997); In re Synchronoss Sec. Litig., 705 F.Supp.2d 367, 389-91 (D.N.J. 2010) (discussing judicial notice pursuant to Federal Rule of Evidence 201).

**DISCUSSION**

**I.   Legal Standards**

    **A.   Rule 12(b)(6), Rule 9(b), and the PSLRA**

A court may dismiss a complaint pursuant to Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6).  In addressing a motion to dismiss a complaint under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine, whether under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  At this stage, a "complaint must contain sufficient factual matter, accepted as true to 'state a

claim to relief that is plausible on its face.'  A claim has
facial plausibility when the plaintiff pleads factual content
that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Ashcroft v.
Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 556 (2007)).  "[W]here the well-pleaded
facts do not permit the court to infer more than the mere
possibility of misconduct, the complaint has alleged--but it has
not 'show[n]'--that the 'pleader is entitled to relief.'" Iqbal,
129 S.Ct. at 1950 (quoting Rule 8(a)(2)).

A securities fraud action, however, "requires more than mere
reference to the conventional standard applicable to motions
under Rule 12(b)(6)." C.W. Sommer & Co. v. Rockefeller (In re
Rockefeller Ctr. Props., Inc.), 311 F.3d 198, 215 (3d Cir. 2002).
Rather, the PSLRA and Rule 9(b) impose heightened pleading
requirements that must be satisfied for a complaint sounding in
securities fraud to survive a motion to dismiss. See In re
Advanta Corp. Sec. Litig., 180 F.3d 525, 531 (3d Cir. 1999).

Rule 9(b) states, "[i]n alleging fraud or mistake, a party
must state with particularity the circumstances constituting
fraud or mistake." Fed.R.Civ.P. 9(b). "This particularity
requirement has been rigorously applied in securities fraud
cases." In re Burlington Coat Factory, 114 F.3d at 1417.  Though

31

Rule 9(b) does not require plaintiffs to plead every material detail of the fraud, it nevertheless "requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue." Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 144 (3d Cir. 2004); In re Rockefeller, 311 F.3d at 217.

Plaintiffs alleging securities fraud must also comply with the heightened pleading requirements of the PSLRA. Chubb Corp., 394 F.3d at 144.  The PSLRA requires plaintiffs to

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  This "particularity [requirement] extends that of Rule 9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading."  In re Rockefeller, 311 F.3d at 218.  Thus, the PSLRA imposes another layer of factual particularity on securities fraud claims.  Chubb Corp., 394 F.3d at 144.

The PSLRA also modifies the burden of pleading intent, or scienter, by requiring plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The required state of mind is "either reckless or conscious" behavior, which may be bolstered--but not shown solely--by allegations tending to show that defendants had the motive and opportunity to commit fraud. Inst'l Investors Grp. v. Avaya, Inc., 564 F.3d 242, 267-68, 276-77 (3d Cir. 2009) (noting that "[a] showing of motive and opportunity" is no longer an independent means of establishing scienter, in light of Tellabs). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'--it must be cogent and compelling, thus strong in light of other explanations." Tellabs, 551 U.S. at 324.

The PSLRA's "strong inference" requirement thus "alters the normal operation of inferences under Rule 12(b)(6)." In re Digital Is. Sec. Litig., 357 F.3d 322, 328 (3d Cir. 2004). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324; see also Winer Family Trust v. Queen, 503 F.3d 319, 327 (3d Cir. 2007).

33

A plaintiff's failure to meet the heightened pleading requirements set forth in Rule 9(b) and the PSLRA justifies dismissal of the complaint apart from dismissal pursuant to Rule 12(b)(6). Chubb Corp., 394 F.3d at 145; In re Intelligroup Sec. Litig., 527 F.Supp.2d 262, 276 (D.N.J. 2007) ("In sum, Rule 9(b) and the [PSLRA] modified the traditional Rule 12(b)(6) analysis for the purposes of pleading 'misrepresentation' and 'scienter' elements."). Accordingly, a modified Rule 12(b)(6) analysis is employed in the securities fraud context in which "catch-all" or "blanket" assertions that do not comply with the particularity requirements of Rule 9(b) and the PSLRA are disregarded. Chubb Corp., 394 F.3d at 145. Therefore, "unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and [the PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations--inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." Id. at 145.

**B.    Section 10(b) and Rule 10b-5**

Section 78j ("Section 10(b)")[5] and Rule 10b-5 create

liability for securities fraud.  Section 10(b) provides, in

pertinent part:

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce or of the mails, or of any
> facility of any national securities exchange –
>
>> (b) To use or employ, in connection with the
>> purchase or sale of any security registered on a
>> national securities exchange or any security not
>> so registered, . . . any manipulative or deceptive
>> device or contrivance in contravention of such
>> rules and regulations as the [Securities Exchange
>> Commission] may prescribe as necessary or
>> appropriate in the public interest or for the
>> protection of investors.

15 U.S.C. § 78j.  Rule 10b-5, which establishes a private cause

of action, was promulgated by the Securities and Exchange

Commission ("SEC") in order to implement this section.  <u>Blue Chip

Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 729 (1975).  Rule 10b-

5 makes it unlawful:

> (a) To employ any device, scheme, or artifice to
> defraud,
>
> (b) To make any untrue statement of a material fact or
> to omit to state a material fact necessary in order to

---

[5] Before the Securities Exchange Act was codified, the contents
of Section 78j appeared in section 10(b) of Public Law 73-291.
<u>See</u> 73 Pub.L.No. 291, 48 Stat. 881 (1934).  As a result, this
provision is commonly referred to as Section 10(b) of the
Securities Exchange Act.

make the statements made, in light of the circumstances
under which they were made, not misleading, or

(c) To engage in any act, practice, or course of
business which operates or would operate as a fraud or
deceit upon any person, in connection with the purchase
or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim for relief under Section 10(b) and Rule
10b-5, a plaintiff must establish six elements:  "(1) a material
misrepresentation (or omission); (2) scienter, i.e., a wrongful
state of mind; (3) a connection with the purchase or sale of a
security; (4) reliance, often referred to in cases involving
public securities markets (fraud-on-the-market cases) as
'transaction causation'; (5) economic loss; and (6) 'loss
causation,' i.e., a causal connection between the material
misrepresentation and the loss."  In re Aetna, Inc. Sec. Litig.,
617 F.3d 272, 277 (3d Cir. 2010) (citation omitted); see Dura
Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).  The
misrepresentation or omission and scienter elements must, as
discussed above, be pleaded with particularity.  15 U.S.C. § 78u-
4(b); In re Intelligroup, 527 F.Supp.2d at 277 ("It appears that
the heightened pleading requirements of PSLRA are inapplicable to
the remaining elements of a 10b-5 claim.").

Defendants dispute that Plaintiffs have adequately pleaded
the falsity, materiality, scienter, and loss causation elements

of their cause of action for securities fraud.  (Defs. Br. at 9,

43, 72, 80-81.)

### 1.    False or Misleading Statements

Rule 10b-5 liability can attach for both affirmative

misstatements and misleading omissions.  Omissions, however, can

give rise to liability only where the defendant had an

affirmative duty to disclose the information in question, such as

"when there is insider trading, a statute requiring disclosure,

or an inaccurate, incomplete or misleading prior disclosure."

Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000); see

Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309, 1321

(2011) ("Disclosure is required . . . only when necessary 'to

make . . . statements made, in the light of the circumstances

under which they were made, not misleading.'") (quoting 17 C.F.R.

§ 240.10b-5(b)).

Under Section 10(b) and Rule 10b-5, each statement at issue

must be analyzed to determine whether each alleged

misrepresentation is pled with the requisite particularity.  In

re Westinghouse Sec. Litig., 90 F.3d 696, 712 (3d Cir. 1996).

Both pre-class period data and post-class period data can be used

to ascertain what the defendant should have known during the

class period.  In re Merck & Co., Inc. Sec. Litig., 432 F.3d 261,

272 (3d Cir. 2005) (explaining that "any information that sheds

light on whether class period statements were false or materially misleading is relevant").

### 2.   Materiality

Rule 10b-5 "explicitly require[s] a well-pleaded allegation that the purported misrepresentations or omissions at issue were material." In re Rockefeller, 311 F.3d at 211.  A fact is material only if "there [is] a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the investing public.  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).  The "materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock."  In re Merck & Co., Inc., 432 F.3d at 269 (discussing the efficient market hypothesis).

### 3.   Scienter

"To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'"  Tellabs, 551 U.S. at 319 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 186, 193-94 & n.12 (1976)). It requires a knowing or reckless state of mind.  Avaya, 564 F.3d at 252.  Statements are reckless when they indicate "an extreme

departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. at 267 n.42.  In determining whether a plaintiff has pleaded scienter with particularity, as required by the PSLRA, a court must take into account "plausible opposing inferences." Tellabs, 551 U.S. at 323.  A plaintiff's pleading standard is satisfied where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

### 4.   Reasonable Reliance

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, the plaintiffs must demonstrate that they reasonably relied on the defendants' allegedly fraudulent misrepresentations or omissions.  Jones v. Intelli-Check, Inc., 274 F.Supp.2d 615, 632 (D.N.J. 2003).  "In order to facilitate securities class-actions, the Supreme Court created a rebuttable presumption of class-wide reliance based on the fraud-on-the-market theory," which is based on the "efficient capital market hypothesis," which in turn posits that "'in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and

its business.'" <u>In re DVI, Inc. Sec. Litig.</u>, 639 F.3d 623, 631 (3d Cir. 2011) (quoting <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 241-42 (1988)).  According to this hypothesis, "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."  <u>Id.</u>

To invoke this rebuttable presumption of reliance, Plaintiffs must show that (1) they traded shares in an efficient market, and (2) the misrepresentation at issue became public. <u>Id.</u>  Defendants may rebut the presumption by "'[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price.'"  <u>Id.</u> at 631-32 (quoting <u>Basic</u>, 485 U.S. at 248).

### 5. Damages and Loss Causation

Plaintiffs in securities fraud cases must plead (1) damages, and (2) that their reliance on the fraud proximately caused those damages.  <u>See</u> <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 174 (3d Cir. 2000).  This second requirement is sometimes called "loss causation."  <u>See</u> <u>id.</u> at 184.  Loss causation "requires a plaintiff to show that a misrepresentation that affected the integrity of [a stock's] market price <u>also</u> caused a subsequent economic loss."  <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 131 S.Ct. 2179, 2186 (2011).  To establish loss causation, a

40

plaintiff "must allege that the subject of the fraudulent statement was the cause of the actual loss suffered, <u>i.e.</u>, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." <u>In re Intelligroup</u>, 527 F.Supp.2d at 297 (internal quotation and citations omitted).  Merely pleading that the price of the security was inflated at the time of purchase is insufficient.  <u>Dura Pharms., Inc.</u>, 544 U.S. at 346-47.  A plaintiff must also plead that the truth was "revealed to the investing public" through means such as the "defendant's corrective disclosure. . . . , whistleblowers, analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward," and the like.  <u>In re Intelligroup</u>, 527 F.Supp.2d at 297 n.18.

### C.   The PSLRA's Safe Harbor for Forward-Looking Statements

The PSLRA contains a safe harbor provision, which protects certain forward-looking statements from Section 10(b) and Rule 10b-5 liability.  The safe harbor provision states:

> in any private action arising under [the PSLRA] that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that–

41

(A) the forward-looking statement is–

    (I) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

    (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement–

    (I) if made by a natural person, was made with knowledge by that person that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1). In the case of an oral forward-looking statement, the requirements set forth in paragraph (A) are satisfied if (1) the oral statement is accompanied by a cautionary statement noting that the statement is forward-looking and results might materially differ from the projections, (2) the oral statement is accompanied by another oral statement indicating that information concerning risk factors that might cause the actual results to materially differ from the projections is readily available in a written document, (3) such written document is specifically identified, and (4) such written document contains a cautionary statement listing important factors that could cause actual results to differ from the projections. 15 U.S.C. § 78u-5(c)(2). This safe harbor was

42

designed to protect statements discussing revenue projections and future business plans from causing liability.  In re Merck & Co., Inc., 432 F.3d at 272.

The safe harbor provision therefore applies to statements that are forward-looking as defined by the statute, provided that they are "(1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false and misleading." In re Aetna, Inc., 617 F.3d at 278-79.  "Forward-looking statement" is defined as

> (A)  a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B)  a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C)  a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [SEC];
>
> (D)  any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

> (E)  any report issued by an outside reviewer retained
>       by an issuer, to the extent that the report
>       assesses a forward-looking statement made by the
>       issuer; or
>
> (F)  a statement containing a projection or estimate of
>       such other items as may be specified by a rule or
>       regulation of the [SEC].

15 U.S.C. § 78u-5(i)(1).  "[A] mixed present/future statement is

not entitled to the safe harbor with respect to the part of the

statement that refers to the present."  Avaya, 564 F.3d at 255

(citation omitted).  Furthermore, cautionary language must be

"extensive and specific"; "a vague or blanket (boilerplate)

disclaimer which merely warns the reader that the investment has

risks will ordinarily be inadequate to prevent misinformation."

Id. at 256.

### D.  Section 20(a)

Section 78t(a) ("Section 20(a)")[6] creates a cause of action

against individuals who are "control persons" of companies liable

for securities fraud.  Jones, 274 F.Supp.2d at 644.  It states:

> Every person who, directly or indirectly, controls any
> person liable under any provision of this chapter or of
> any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as
> such controlled person to any person to whom such
> controlled person is liable, unless the controlling

---

[6] Before the Securities Exchange Act was codified, the contents
of Section 78t(a) appeared in section 20(a) of Public Law 73-291.
See 73 Pub.L.No. 291, 48 Stat. 881 (1934).  As a result, this
provision is commonly referred to as Section 20(a) of the
Securities Exchange Act.

person acted in good faith and did not directly or
indirectly induce the act or acts constituting the
violation or cause of action.

15 U.S.C. § 78t(a).

Under this section, individuals are held liable for
exercising control over a corporation that has committed
securities fraud.  In re MobileMedia Sec. Litig., 28 F.Supp.2d
901, 940 (D.N.J. 1998).  Plaintiffs alleging a Section 20(a)
violation "must plead facts showing:  (1) an underlying violation
by the company; and (2) circumstances establishing defendant's
control over the company's actions."  Jones, 274 F.Supp.2d at
645.  Thus, if the plaintiff does not establish that any
controlled person is liable under the PSLRA, then there can be no
controlling person liability under Section 20(a).  In re Suprema
Specialties, Inc. Sec. Litig., 438 F.3d 256, 287 (3d Cir. 2006);
Avaya, 564 F.3d at 252 ("[L]iability under Section 20(a) is
derivative of an underlying violation of Section 10(b) by the
controlled person.").

## II.  Section 10(b) and Rule 10b-5 Standards Applied Here

We find that Plaintiffs have failed to state a claim for
relief for securities fraud with respect to all counts in the
Second Amended Complaint.  The allegedly false and misleading
statements identified in the Second Amended Complaint are not
actionable, because they have either not been pleaded with the

45

requisite particularity as to either falsity or scienter, or constitute forward-looking statements subject to the PSLRA's safe harbor provision.

### A. Alleged Material Misrepresentations and False Statements

The statements alleged to be false or misleading by Plaintiffs generally address four topics, all of which relate to the overarching theme of Anadigics's ability to meet customer demand:  (1) wireless handset customers' over-ordering, or stockpiling, of Anadigics's products; (2) wireless handset customers' practice of dual-sourcing, or ordering from both Anadigics and a competitor for the same products with the intention of cancelling one order once the other is filled; (3) the availability of additional via etchers to increase manufacturing capacity at the fab; and (4) Anadigics's response to the Intel yield problem and its effect on available stock for wireless handset customers.  (2d Am. Compl. at ¶ 115.)  We consider the statements alleged to be false and misleading in context below, considering at the same time their materiality and whether the statements are forward-looking and accompanied by meaningful cautionary language such that they might be protected by the PSLRA's safe harbor provision.

### 1.   February 12, 2008 Press Release

#### a.   "Working to build further market share"

We find that Bastani's statement in the February 12, 2008
press release that Anadigics was "working to build further market
share with [its] top-tier customers" is both not demonstrably
false or misleading, and moreover, non-actionable optimistic
language.  Although Bastani acknowledged in the earnings call
held the same day that demand had exceeded supply in the fourth
quarter of 2007, that earnings call also explains that the
concept of Anadigics's "working . . . with" customers was in the
context of having put customers on allocation.  (See 2-12-08
CallStreet Tr. at 8 ("We work very closely with customers and do
our best . . . [to] match it up to the availability of product at
any given time"); id. at 16 ("Clearly in fourth quarter [2007]
demand exceeded our supply.  And that's why we're engaged with a
portfolio management and also working with our top tier customers
in terms of anticipating what part of their demand we can satisfy
and what parts of it we will not.") (emphasis added).)

To the extent Plaintiffs contend this statement was false
and misleading because "Bastani had been informed . . . that the
Company's key wireless handset customers were dual sourcing"
sometime in the beginning of the first quarter of 2008, this
suggests a failure to disclose rather than an affirmative false

statement.  (2d Am. Compl. at ¶ 117.)  However, "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak [since a] duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information. . . . Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  In re Intelligroup, 527 F.Supp.2d at 281-82 (citations omitted); see also In re Burlington Coat Factory, 114 F.3d at 1432 ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.  [Management's] possession of material nonpublic information alone does not create a duty to disclose it.").  Plaintiffs have alleged no particularized facts showing "insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure" to support an inference that a duty to disclose existed.  Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000); see In re Synchronoss Sec. Litig., 705 F.Supp.2d 367, 421 (D.N.J. 2010) (observing that a duty to update prior statements through a disclosure contradicting rumors in the marketplace would arise only if defendants themselves affirmatively introduced such rumors into the market).

Plaintiffs' vague allegations that someone at Anadigics was aware that wireless handset customers were dual sourcing

48

beginning in January 2008 is immaterial in any event, because, as the Second Amended Complaint acknowledges, due to lead times and production cycles, any cancelled orders resulting from the alleged dual sourcing would not become evident until the second or third quarters of 2008.  (2d Am. Compl. at ¶ 105.)

The statement can also be deemed to fall within the safe harbor provision of the PSLRA in stating, "We are <u>expecting</u> to buck seasonality in Wireless in the first quarter while working to build further market share with our top tier customers."  (2-12-08 Press Release at 1 (emphasis added).)  Accompanied by the meaningful cautionary language in the Safe Harbor statement on the second page of the press release, which advises, "projections and other forward-looking statements . . . can generally be identified as such because the context of the statement will include words such as 'believe', 'anticipate', or 'expect'," this statement constitutes a statement of future economic performance.  15 U.S.C. § 78u-5(i)(1)(C).  Moreover, "[w]orking to build market share" is a vaguely optimistic statement understood by reasonable investors as puffery.  <u>See</u> <u>Bldg. Trades United Pension Trust Fund v. Kenexa Corp.</u>, No. 09-2642, 2010 WL 3749459, at *11 (E.D. Pa. Sept. 27, 2010) ("A securities defendant's statements that the company will 'continue to do well and gain market share and outperform the competition

49

[are], without more, simply expressions of confidence in the viability of [defendant's] future business which do not give rise to a securities violation.'" (quoting <u>Steinberg v. Ericsson LM Tel. Co.</u>, No. 07-9615, 2008 WL 5170640, at *9 (S.D.N.Y. Dec. 10, 2008)).

>           **b.    "We continue to improve . . . manufacturing
>                   efficiencies"**

The Court finds the statement, "We continue to improve our manufacturing efficiencies and our production capacity plans continue to progress through equipment expansion in our New Jersey fab, qualifying external foundries and building our next fab in China," not materially false or misleading.  The allegations in the Second Amended Complaint are consistent with this statement.  (<u>See, e.g.</u>, 2d Am. Compl. at ¶ 57 ("Defendants realized that . . . ensuring sufficient production capacity was a critical issue they would have to address"); <u>id.</u> at ¶ 62 ("Shields confirmed that Anadigics was preparing . . . to meet the anticipated increase in demand," including "the installation of additional fab equipment"); <u>id.</u> at ¶ 63 ("Anadigics looked to further expand its capacity by building a new fab facility in China"); <u>id.</u> at ¶ 67 ("Defendants knew that the Company needed to 'ramp up' production at the fab to keep up with demand, and started to invest in new machines even before the Class Period began"); <u>id.</u> at ¶¶ 68-69 (stating that Anadigics hired a

fabrication specialist to help management discern how to increase manufacturing capacity at the fab); id. at ¶ 73 ("CW 2 stated that the ramping up process was intense. . . . At least initially, Anadigics was able to increase the fab's production capacity.").)  Plaintiffs' argument appears based on the notion that Defendants should have disclosed to the market that production capacity improvement was constrained by the lack of via etchers.  But as noted above, Plaintiffs have pleaded no facts showing that there was a duty for Anadigics to disclose that information.  In re Intelligroup, 527 F.Supp.2d at 281-82.

We further find this statement forward-looking insofar as it refers to the future implementation of "plans."  15 U.S.C. § 78u-5(i)(1)(B) (defining forward-looking statement as including "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the user").

### 2.   February 12, 2008 Earnings Call

#### a.   Denial of Knowledge of Customer Over-Ordering

The February 12, 2008 Earnings Call contains Bastani's assertion that Anadigics had "very tight communications" with its customers and did not suggest any problem of customer over-ordering.  (2-12-08 CallStreet Tr. at 18-19; 2-12-08 Thomson Tr. at 24-25; 2d Am. Compl. at ¶ 118.)  He stated that while

51

customers "would like to build some buffer inventories,"
Anadigics was working "hand in glove with them to meet their
demands." (Id.)  Plaintiffs have made no allegations whatsoever
suggesting that Anadigics was not in fact in close communication
with its customers or working with them to meet demand to the
best of its ability.  Bastani references this communication,
necessitated by allocation of available inventory, during the
February 12, 2008 Earnings Call.  See supra at 47 (discussing 2-
12-08 CallStreet Tr. at 16).  Bastani acknowledged that customers
might wish to build a buffer inventory, but that "based on the
visibility" he had at the time, he did not see it as an issue.
(2-12-08 CallStreet Tr. at 19.)

     We find that Plaintiffs have not shown Bastani's statements
regarding possible customer over-ordering to be materially false
or misleading.  Based on the projections for increased demand and
customers' optimistic guidance for the first quarter of 2008, the
Court fails to see how Bastani might have determined whether
over-ordering had occurred or was occurring at that time, given
the allegations that cancelled orders would not become evident
until later on due to lead times and production cycles.  (2d Am.
Compl. at ¶¶ 4, 6, 105.)  However, we find that these statements
are not forward-looking, as Bastani refers to "where we are

today" and Anadigics's present engagement with customers.  (<u>Id.</u> at ¶ 118.)

>    **b.    Working With Customers to Meet Increased Demands and Increased Production Capacity Plans**

Plaintiffs allege that Defendants misleadingly stated during the February 12, 2008 Earnings Call that Anadigics would "continue to work directly with our customers on meeting their increased demands" and that Anadigics's "increased production capacity plans continue to progress forward through continuous improvement in manufacturing efficiencies . . . and equipment expansions in the New Jersey fab as well as engaging qualifying external foundries" and building the China fab.  (2d Am. Compl. at ¶ 120.)  These statements are substantively similar to those identified in the February 12, 2008 Press Release, and are not actionable for the same reasons discussed above.

Plaintiffs have not met their burden of demonstrating with particularity that these statements are materially false, but instead seem to imply that Defendants should have disclosed the via etcher problem and other constraints on meeting demand.  As noted previously, there is no such duty, and perhaps more importantly, the manufacturing problems identified by Plaintiffs do not compel the conclusion that it was false for Bastani to represent that Anadigics was working with customers to meet

53

demand or that Anadigics was continuing to pursue production capacity expansion plans.  Regardless, Defendants disclosed during the call that the New Jersey fab had not yet reached full manufacturing capacity, and they did not expect it to do so until "the late third quarter, early fourth quarter" of 2008 due to "equipment coming in, getting installed, people trained."  (2-12-08 CallStreet Tr. at 16.)  This representation is entirely consistent with Plaintiffs' allegation that additional via etchers ordered in January 2008 would be delivered within six months and take another "couple of months" to come online.  (See 2d Am. Compl. at ¶¶ 9, 71, 155.)  Thus, the timeline in which the via etcher problem would be remedied was effectively part of the total mix of information available to investors, such that failure to disclose the via etcher problem specifically was not materially false or misleading.

We further note that the reference to plans to increase capacity continuing to progress forward is a forward-looking statement.  15 U.S.C. § 78u-5(i)(1)(B).

### c. Alleged Material Omissions Regarding the Intel Yield Problem

Plaintiffs allege that Defendants "omitted material information regarding the Intel yield issues when asked directly about their relationship with Intel" during the February 12, 2008 Earnings Call.  (2d Am. Compl. at ¶ 125.)  Specifically,

Plaintiffs point to Shields's statement that "we believe we are one of the best relative to our manufacturing operations and yield" in response to an analyst's question about whether Anadigics felt comfortable with its yield progress.

We find Shields's statement to be a vague and qualified statement of optimism and puffery, and there is no indication in the transcripts of the call that the question related to Intel specifically. "We believe we are one of the best" is not a material representation, but rather a subjective statement of optimism too vague to be actionable. See In re Aetna, Inc., 617 F.3d at 283.

Plaintiffs also take issue with Bastani's response to a question about Anadigics's relationship with Intel ("Do you believe your Intel business will grow year over year?"). (2d Am. Compl. at ¶ 125.) Bastani stated, "Looking into the business as it shapes up into Q2 wireless LAN is absolutely one of the strengths." (Id.) We find that the Second Amended Complaint does not allege any facts that would support a plausible inference that this statement was materially false or misleading. Plaintiffs' allegations that Defendants chose to divert manufacturing capacity from wireless handset customers in order to fill Intel orders only supports Bastani's statement that business with Intel was strong. Nothing about the analyst's

Intel question imposed a duty on Anadigics to disclose the Intel
yield problem at that time.  Furthermore, this is a forward-
looking statement subject to the safe harbor provisions of the
PSLRA in the context of the question posed.  15 U.S.C. § 78u-
5(i)(1)(C).

### 3.   February 29, 2008 Form 10-K

Plaintiffs allege that Anadigics's Form 10-K for fiscal year
2007, filed on February 29, 2008, misleadingly failed to inform
the market about the via etcher problem and that manufacturing
capacity would be constrained at least until the summer of 2008.
(2d Am. Compl. at ¶ 128.)  The form states that Anadigics had
capital equipment purchase requirements of $17.6 million,
primarily over the first half of 2008, which "will serve to
increase the installed equipment capacity of the Company's
manufacturing operations in response to increases in customer
demand for the Company's products."  (Id.)

As noted previously, the mere existence of the via etcher
problem, which Defendants generally disclosed in the February 12,
2008 Earnings Call by providing guidance that due to production
constraints caused by delivery and installation of new equipment,
the fab was not expected to be operating at capacity until the
"late third quarter, early fourth quarter" of 2008, does not
compel the logical conclusion that any statement by Defendants

regarding efforts to increase manufacturing capacity must be false or misleading.  (2-12-08 CallStreet Tr. at 16.)  Nor have Plaintiffs pleaded any facts that either this statement is materially false or misleading, or Defendants were under some duty to disclose the exact nature of the via etcher problem specifically.  See Kenexa Corp., 2010 WL 3749459, at *12.  Additionally, the statement is forward-looking, regarding expected future increase in manufacturing capacity.  15 U.S.C. § 78u-5(i)(1)(B).

Because the Form 10-K contains meaningful cautionary language in its discussion of "risk factors," we find that the challenged statement regarding manufacturing capacity is subject to the safe harbor provision of the PSLRA.  (See 2-29-08 Form 10K at 11-12.)  Significantly for purposes of this action, the Form 10-K expressly states:

> Our customers' demand has outpaced our current manufacturing capacity.  In the event that we are unable to satisfy demand from any one of our customers or our customers in the aggregate, we may not be viewed as a dependable high volume supplier and our customers may source their demand elsewhere.
>
> The Company has had significant growth in revenues over the past two years whereby demand has exceeded our available capacity.  While the Company has made capital investments to expand equipment capacity in its primary fab in Warren, NJ and is constructing a facility in China and pursuing foundry relationships, we may not be able to add capacity at a sustainable pace with the growth of the market or with the growth of our

> customer's [sic].  In the event we continue to be
> unable to meet our customers' demand, we may be
> considered an undependable supplier and our customers
> may seek alternative suppliers.  If our customers seek
> alternative suppliers, our operating results could be
> adversely affected, as we may be unable to find
> alternative sources of revenue.

(Id. at 12.)[7]

### 4.  April 22, 2008 Earnings Call

#### a.  Statements Regarding Meeting Customer Demand

During Anadigics's April 22, 2008 Earnings Call to discuss the first quarter of 2008, an analyst asked:  "[Y]ou said you'd be at full capacity in the second half of 2008.  At this point, are you meeting full customer demand?  Are you still constrained in some cases?"  (2d Am. Compl. at ¶ 129.)  Bastani responded that having "had a lot of high level relationship discussions with our customer . . . basically, we have matched our expectations and their expectations. . . . So where we care, the answer is yes.  We are perfectly aligned."  (Id.)  Bastani

---

[7] Insofar as the April and July press releases and conference calls relied upon by Plaintiffs in this action directly incorporate Anadigics's 2007 Form 10-K filing, we find that the above language suffices as the required meaningful cautionary language that is "substantive, extensive, and tailored to the future-looking statements" referenced with respect to statements reflected in those documents as well.  Avaya, 564 F.3d at 257-58; Kenexa Corp., 2010 WL 3749459, at *14 (stating that risk disclosures "need not actually accompany the alleged misrepresentation," because "language contained in the company's SEC filings may be incorporated into earnings releases and conference calls").  (See 4-22-08 Press Release at 4; 4-22-08 CallStreet Tr. at 1; 7-22-08 Press Release at 4; 7-22-08 CallStreet Tr. at 1.)

conceded that in the low end phone and developing markets, Anadigics was not making an effort to meet demand, but concluded that Anadigics had "been aligning our strategies very well with our partners and our customers and they are being happy and now we are happy."  (Id.)

Plaintiffs assert this statement was materially false and misleading because Bastani and Shields already knew that their customers were frustrated with Anadigics's inability to fill orders on time and had resorted to over-ordering and dual sourcing.  (Id. at ¶ 130.)  Defendants contend that this statement about "aligning . . . strategies very well with our partners" should be properly taken in context of a preceding discussion about Anadigics's optimism for strength in the high-margin 3G high end cell phone and smartphone market due to having done design work for Qualcomm, which was "doing phenomenally well" according to Shields.  (4-22-08 CallStreet Tr. at 8-9.) Bastani further observed in response to a question about 3G customers that Anadigics viewed "Qualcomm as the strongest force out there . . . and there are new players coming in," including Sony Ericsson, Broadcom, NXT/STMicro, and others.  (Id. at 13.)

We agree with Defendants that taken in context, Bastani's statement about "where we care, . . . we are perfectly aligned" with customer demand is reasonably viewed as referring to

customers such as Qualcomm, not Samsung or LG.  The Second Amended Complaint's allegations of customer over-ordering and dual sourcing refer specifically only to Samsung and, to a lesser extent, LG.  Even accepting those as true, the Second Amended Complaint notes that cancelled orders due to over-ordering or dual sourcing would not become evident until "the second to third quarters of 2008."  (2d Am. Compl. at ¶ 105.)  Plaintiffs' allegation that this statement was materially false and misleading because "Bastani knew that Anadigics had lost all credibility with its wireless handset customers" is not supported by particularized factual allegations.  (Id. at ¶ 131.)

We take judicial notice that Anadigics reported in its Form 10-K for 2008 that Samsung remained one of Anadigics's top customers in 2008, accounting for 16% of net sales, an increase over Samsung's 13% of net sales in 2007.  (2-29-08 Form 10-K at 10; 12-3-10 Alessi Aff., Ex. 57, 3-2-09 Form 10-K at 9.)  See In re IAC/InterActive Corp. Sec. Litig., 695 F.Supp.2d 109, 121 (S.D.N.Y. 2010) (noting that "there is no question that the Court may consider public SEC filings" on a motion to dismiss, and rejecting plaintiffs' characterization of defendants' reliance on financial results from the time period in question and the following year as "inappropriate factual disputation").  Thus, Anadigics's financial results belie Plaintiffs' claim that

60

Anadigics had "lost all credibility" with its wireless handset customers.  Nothing in the record before the Court supports an inference that either Samsung or LG would constitute the type of low-end phone customers that Anadigics apparently made the strategic decision to not supply.  (See 2-29-08 Form 10-K at 10 (stating that sales to Samsung accounted for 13% and sales to LG accounted for 10% of net sales during 2007); 4-22-08 CallStreet Tr. at 2 ("Our top customers in revenue for the first quarter 2008 included Samsung, Intel, LG and Huawei.").)

This statement is not subject to the protection of the safe harbor provision.  Both the question and the answer ("At this point, are you meeting full customer demand? . . . The answer is yes, we are perfectly aligned") refer to present time, not a future projection.

### b.   Statements Regarding Samsung

During the same earnings call, an analyst asked Bastani about a rumor that one of Anadigics's competitors was talking about taking a share of Samsung business away from Anadigics, the current incumbent, with respect to front-end module phones.  (2d Am. Compl. at ¶ 132.)  Bastani replied, "I don't believe I am losing anything to anybody.  There's so much demand out there. There's plenty to go around for everybody.  I hope everybody gets

a piece of it.  Certainly, as you can see from our growth, we are riding the wave in a very strong way."  (Id.)

Defendants argue that Bastani's statements regarding the front-end module market are forward-looking.  The Court agrees. Plaintiffs disregard the language of the analyst's question, which stated:  "How competitive do you think you will be on the front end module side and when do you think the front end modules really become more important for the Korean guys?"  (4-22-08 CallStreet Tr. at 10 (emphasis added).)  This question clearly seeks forward-looking guidance.  Bastani's response consists of subjective, non-actionable optimism, and forward-looking statements subject to the safe harbor provision "guesstimat[ing]" the future demand and usage for front-end modules.  (Id.) Plaintiffs also allege that Bastani's remarks acknowledging "relentless rumors left and right about market share and gain and loss and things like that," but asking the analysts to "have faith in us" in light of Anadigics having "delivered 12 consecutive quarters of growth that is market share had have guided to the 13th . . . as we work toward delighting our customers," were false and misleading because Samsung had allegedly "internally decided to stop using Anadigics as a supplier."  (2d Am. Compl. at ¶¶ 132-33; 4-22-08 CallStreet Tr. at 19.)  Defendants correctly assert that the Second Amended

62

Complaint is misleading insofar as it suggests that this reference to "rumors about . . . market share" has anything to do with Samsung or the question regarding front-end modules specifically.  Rather, this statement concludes the conference call and contains mere sales talk and forward-looking statements about "Q2 guidance momentum."  (2d Am. Compl. at ¶ 132.)

Plaintiffs make no allegation that Bastani's statement regarding Anadigics's 12 consecutive quarters of growth was false or misleading.  Even presuming Plaintiffs pleaded particularized facts showing that Samsung had made an internal decision to stop using Anadigics as a vendor sometime in April 2008, we find that Bastani's concluding remarks are simply not actionable insofar as they are forward-looking and immaterial.[8]

---

[8]  Whether Bastani knew at the time of the 4-22-08 Earnings Call that Samsung had decided to stop using Anadigics as a supplier goes more to scienter than falsity.  Regardless, the allegations are not sufficiently particularized to support the inference that as of the date of the call, Bastani would have known of Samsung's alleged internal decision.  (See 2d Am. Compl. at ¶¶ 103-104 & n.3 (stating that CW 6 was told while working at Intel that Samsung gave Anadigics a "disqualified rating around April 2008" (emphasis added)).)  Moreover, Plaintiffs overstate Samsung's alleged internal decision to "stop using Anadigics" as a vendor, insofar as they also allege that CW 6, once he became employed at Anadigics, successfully rehabilitated Anadigics's relationship with Samsung.  (Id. at ¶ 104.)  Additionally, Anadigics noted during its July 22, 2008 Earnings Call that Intel, Samsung, LG, and Huawei remained its top customers in revenues for the second quarter of 2008.  (7-22-08 CallStreet Tr. at 2.)

### c.   Representations Regarding Market Share

Plaintiffs allege that Shields falsely and misleadingly stated during the 4-22-08 Earnings Call that "efficiencies are improving and we are really gaining the confidence of our customers relative to shipments going forward."  (2d Am. Compl. at ¶ 134.)  In response to a question about anticipated volume of wireless handset components for the second quarter of 2008, Shields stated, "while we haven't had any press release to comment on relative to additional customers in the wireless space, we've been growing relative share with our customers.  So as we look at the perhaps the platform to be shifting the second half is opportunity for us to continue to gain share.  So if the customers in the market and the economy bodes well, obviously we are looking to have a continuation of the increasing revenue [in] wireless each quarter."  (Id.; 4-22-08 CallStreet Tr. at 14.)

We find Shields's statements, in context, to be forward-looking optimistic projections about the upcoming quarter, subject to the safe harbor provision of the PSLRA.  Qualifying the statement regarding customer confidence as "relative to shipments going forward" makes clear that it does not refer to present fact or condition.  And we find "growing relative share with our customers" so vague as to be non-actionable, but generally corroborated by the fact of Anadigics's continued

growth in the second quarter of 2008 over the first quarter being discussed in the 4-22-08 Earnings Call. (12-23-09 Alessi Aff., Ex. 30, 7-22-08 Press Release.) Finally, as noted previously, the mere existence of manufacturing difficulties such as the via etcher problem does not compel the conclusion that it would be false for Defendants to reference its efforts and plans toward increasing manufacturing efficiencies.

### 5. July 22, 2008 Press Release

Defendants announced in a July 22, 2008 Press Release that "softness in industry demand and inventory re-balancing . . . may occur in the third quarter 2008 from our Wireless customers." (4-22-08 Press Release at 1; 2d Am. Compl. at ¶ 144.) Defendants attributed this expected decline to customers' lowering demand expectations and reducing inventory levels. (Id.) However, Defendants stated that they believed the softness in the wireless market to be "temporary," in light of an increase in "design-in activity." (Id.) Plaintiffs contend these statements are misleading because the decline in demand actually reflected "the likely permanent loss of market share to Anadigics' competitors" as a result of the company's inability to fill customers' firm orders. (2d Am. Compl. at ¶ 145.)

As the Court has already noted, the allegations in the Second Amended Complaint do not support the conclusion that

Anadigics permanently lost the business of, e.g., Samsung.  See supra n.8.  Additionally, the statement in the 7-22-08 Press Release that demand was expected to decrease for the third quarter of 2008 due to "inventory re-balancing" is consistent with Plaintiffs' allegations that Anadigics's wireless handset customers were over-ordering or stockpiling inventory, undermining any inference that Anadigics's proffered explanation is false or misleading.  Plaintiffs have not pleaded particularized factual allegations showing that the statements at issue were materially false or misleading.  But in any event, the Court would find that the statements are forward-looking forecasts of future demand, accompanied by meaningful cautionary language, subject to the safe harbor provision of the PSLRA.  See In re Cutera Sec. Litig., 610 F.3d 1103, 1111-12 (9th Cir. 2010); Avaya, 564 F.3d at 258-59.

### 6.   July 22, 2008 Earnings Call

#### a.   Reasons for Anticipated Decrease in Demand

Plaintiffs allege that Bastani "continued to falsely attribute the drop in wireless handset demand as excess inventory on the part of the Company's customers" during a July 22, 2008 Earnings Call.  (2d Am. Compl. at ¶ 146.)  Plaintiffs contend that the real reason for the decrease in demand was loss of market share, not excess inventory.  (Id.)  Plaintiffs also

allege that Bastani misleadingly or falsely indicated that the decrease in demand was a general marketplace phenomenon.  (Id. at ¶ 148; 7-22-08 CallStreet Tr. at 5 ("The weaknesses we have seen are no different than what has already been talked about in the industry.").)

The transcript of the earnings call shows that Defendants did acknowledge a loss of market share resulting from Anadigics's inability to "fill the prescription" as part of the reason for anticipating decreased demand from wireless handset customers. (7-22-08 CallStreet Tr. at 11-12.)  Bastani went on to observe that Anadigics was "engaged in every design that goes on right now" such that it remained committed to increasing manufacturing capacity.  (Id. at 12.)  He also made a non-actionable statement of subjective sales talk that Anadigics intended to "reap the benefits of [its] strong market position."  (Id.)  See Kenexa Corp., 2010 WL 3749459, at *11.

As we observed with respect to the July 22, 2008 Press Release, representations by Anadigics that customer demand was weaker than expected due to excess inventory is consistent both with Plaintiffs' allegations that customers had engaged in over-ordering and/or dual sourcing, as well as Anadigics's disclosures to the market throughout the Class period that it was not able to consistently meet customer demand and had allocated available

67

inventory, working with customers in doing so.  Bastani explained
that Anadigics had reason to believe that decrease in demand
would be temporary because Anadigics was (1) "running stronger
than last year, quarter to date, on the wireless backlog," in
projections for the last quarter of 2008, and (2) seeing "a lot
of designing activities" for its products with both existing and
new customers.  (7-22-08 CallStreet Tr. at 5.)  Plaintiffs'
contention that "Bastani was aware that the drop in demand was
not a general marketplace phenomenon" is conclusory and
disregards the context of the rest of the earnings call.  (2d Am.
Compl. at ¶ 149.)  These statements thus are not materially false
or misleading in light of the total mix of information available
to investors, and furthermore are forward-looking projections of
future economic performance in the next quarter subject to the
safe harbor provision of the PSLRA.

###    b.    Statements Regarding Samsung

An analyst asked Shields during the July 22, 2008 Earnings
Call about what reasons Anadigics's customers were giving
Anadigics for the decrease in demand and whether Shields thought
the slowdown would be temporary.  (7-22-08 CallStreet Tr. at 6.)
Shields responded, "I just look at Samsung and Samsung has said
that they still envision doing 200 million units for the year,
while they may have been down from Q1 to Q2, . . . unless they

come back to the Street and tell folks it will be less than 200 million, there's reason to believe that based on our share we should be the recipient of nice growth." (Id.; 2d Am. Compl. at ¶ 150.)  Shields further stated that "there are certain indications at least that when we sit down with customers that could call for better performance, now obviously we are cautious just like the next guy because sometimes you would think it would take one, two quarters to correct itself.  So yes, the fact is really an inventory rebalancing as one customer has indicated." (Id.)

We find that Shields's statement of subjective belief that Anadigics "should be the recipient of nice growth" is vague and non-actionable as immaterial, and was qualified by cautionary language.  15 U.S.C.A. § 78u-5(c)(1)(A)(ii); In re Aetna, Inc., 617 F.3d at 283-84.  (See 7-22-08 CallStreet Tr. at 6.)  The statement, "The fact is really an inventory rebalancing as one customer has indicated," is vague and immaterial insofar as it does not express which customer allegedly indicated the same to Defendants; the Court finds no factual basis to support an inference that this references Samsung particularly.

### c.  Statements Regarding Expansion Plans

Plaintiffs allege that Defendants falsely claimed that Anadigics was ready and able to meet a potential surge in

69

wireless customer demand, and accordingly continued to pursue its plans to install additional equipment at the fab.  (2d Am. Compl. at ¶ 152; 7-22-08 CallStreet Tr. at 7 (Bastani: "[A]s we experienced last year, when these guys [customers] turn on a dine they turn on a dime.  So you better be prepared serving them."); id. (Shields: "We made the commitment to make sure that we are going to be there when that demand surge potentially happens.").)

Plaintiffs take these statements out of context. Immediately prior to these statements, an analyst made the observation that "[o]bviously a long-term forecast is still very robust and Nokia did talk pretty positively about the overall demand for the industry this year from a guidance."  (Id.)  The statements regarding Anadigics's intention to be prepared for a "potential surge" in demand at some future point were forward-looking, made in response to the analyst's point about long-term forecasts looking robust, and thus subject to the safe harbor provisions of the PSLRA.  We further find that insofar as they are consistent with Defendants' stated position that the downturn in demand was temporary, Plaintiffs have not shown them to be materially false or misleading.

### d.   Current Ability to Meet Customer Demand

An analyst asked Bastani during the July 22, 2008 Earnings Call the following question:  "You know Bami, you mentioned that

70

you just don't have the capacity to meet some of the demand out there.  Is that all on the 3G side of things right now?  Or is that some other legacy as well?"  (7-22-08 CallStreet Tr. at 12; 2d Am. Compl. at ¶ 154.)  Bastani replied, "That was a comment about the past.  That was like a Q4, Q1 comment.  We have shipped a lot of the stuff."  (Id.)  Another analyst asked, "To the extent you guys have been managing a fairly tight capacity over the past couple of quarters, can you help me understand how that progressed through the June quarter, whether it be customers and allocation, lead time to customers?"  (7-22-08 CallStreet Tr. at 16; 2d Am. Compl. at ¶ 156.)  Bastani responded that "in Q2, demand and supply were pretty much in balance. . . . The areas we saw a lot of pull-in was primarily in the broadband area and included WiFi, included FiOS, [and] DOCSIS 3.  So a lot of it was new products and new things coming to market."  (Id.)  Bastani was also asked directly whether he thought Anadigics's supply had caught up to demand, to which Bastani answered, "Yes."  (7-22-08 CallStreet Tr. at 16-17; 2d Am. Compl. at ¶ 156.)  Bastani concluded the earnings call with the following statement: "Wireless is sequentially down.  We believe that is primarily due to softness in the market and some inventory correction at customers.  Our relationships are very strong.  This includes Qualcomm, Intel, Motorola, Cisco."  (7-22-08 CallStreet Tr. at 18.)

Plaintiffs have alleged no facts that the manufacturing constraints at the fab would have affected the balance of supply and demand with respect to WiFi, FiOS, and DOCSIS 3 products, none of which involve wireless handsets. Accordingly, we find that this second statement has not been shown to be materially false or misleading. We also find that Plaintiffs have pleaded no facts showing that Bastani's concluding statements that the wireless market had softened due to economic conditions and inventory correction, and that Anadigics enjoyed strong relationships with Qualcomm, Intel, Motorola, and Cisco, were materially false or misleading.

However, we do find that Plaintiffs have made a showing, based on the facts pleaded in the Second Amended Complaint, that if production capacity for power amplifier modules at the fab was constrained due to the via etcher problem and compounded by the Intel yield problem, it could plausibly be false and misleading for Bastani to represent to investors that (1) as of July 22, 2008, demand for 3G products had fallen into balance and back orders had been shipped, and (2) supply had caught up to demand, where Plaintiffs have also plausibly alleged that an increase in manufacturing capacity of that magnitude would not occur until

72

somewhere between June and September 2008 due to equipment delivery time as well as lead time for the production cycle.[9]

### 7. Summary of Alleged Materially False or Misleading Statements Satisfying Plaintiffs' Pleading Standard

The Court has found that only two of the statements identified by Plaintiffs as materially false or misleading have satisfied Plaintiffs' pleading standard under the PSLRA and Rule 9(b).  Bastani's assertions during the July 22, 2008 Earnings Call that supply shortages were no longer a concern because supply and demand were in balance at that point, suggesting that demand no longer outstripped available manufacturing capacity despite the fact that as alleged, additional via etchers were unlikely to have yet come online at the New Jersey fab, could plausibly be false.  (2d Am. Compl. at ¶¶ 154, 156.)  Thus, we continue with our analysis as to that representation.

Furthermore, we found many of the statements identified in the Second Amended Complaint as allegedly false or misleading to be forward-looking, such that they are not actionable pursuant to the safe harbor provision of the PSLRA.  Because we found that each of the forward-looking statements was accompanied by meaningful cautionary language and/or immaterial, see supra at

---

[9] Defendants acknowledge that Bastani's statement that Anadigics's supply had caught up to demand is a not forward-looking statement subject to the safe harbor provision.  (See Defs. Br. at 73 & 17.)

n.7, we need not address the question of whether they were made with actual knowledge that the statement was false and misleading.  (See 2d. Am. Compl. at ¶¶ 120, 125, 128, 132, 134, 144, 146, 148, 150, 152.)  In re Aetna, Inc., 617 F.3d at 278-79 ("[T]he safe harbor applies to statements that are forward-looking . . . provided that they are (1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading.").

**B.   Scienter**

> **1.   Failure to Disclose Alleged Over-Ordering and Dual Sourcing by Wireless Handset Customers**

Although we have found that a vast majority of the statements identified in the Second Amended Complaint are not actionable, and that Plaintiffs pleaded no facts that would support the inference that Defendants were under a duty to disclose to the market the alleged over-ordering and dual sourcing allegedly being done by Anadigics's wireless handset customers, we will still address what we perceive to be an inadequate pleading of scienter.

With respect to the allegations that Defendants misleadingly omitted to disclose to the market that Anadigics's customers were engaging in over-ordering or dual sourcing, or that Defendants' affirmative statements were false and misleading because they

were allegedly made with the knowledge that customers were over-ordering or dual sourcing, Defendants contend that the allegations are not stated with particularity.  Although the Second Amended Complaint states that the CWs indicated that as early as September 2007, Anadigics was "already behind the eight ball," "struggling to fill orders," and "not always successful in keeping up with demand," Defendants contend that Plaintiffs failed "to allege any particularized facts demonstrating that any specific Anadigics customer <u>actually</u> cancelled any existing order."  (2d Am. Compl. at ¶ 74; Defs. Br. at 18.)  The Second Amended Complaint alleges that CW 1 "witnessed Bastani making product commitments before and during the Class Period to customers that the Company's two principal sales managers . . . would later be forced to rescind because of the fab's capacity restrains."  (2d Am. Compl. at ¶ 95.)

The Second Amended Complaint, however, does not include any particular examples of missed orders.  Rather, the premise that Anadigics was missing orders is inferred from allegations that Samsung and LG began double sourcing in the first quarter of 2008, according to CW 1.  (2d Am. Compl. at ¶ 99.)  These allegations vaguely state that "[a]ccording to CW1," Samsung and LG informed unnamed Anadigics sales representatives "that they were extremely frustrated with the continuous missed orders, and

were going to 'dual source' the components they needed." (Id. at ¶ 100.) The sales representatives allegedly informed an Anadigics employee named Marcus Wise about Samsung and LG's frustration with missed orders, who in turn allegedly informed the Individual Defendants at a weekly production meeting sometime "early in the first quarter" of 2008. (Id.)

A securities fraud plaintiff may provide factual support for a complaint through confidential sources, but "statements from such sources can only be used: (1) if the complaint sets forth other factual allegations, such as documentary evidence, which are alone sufficient to support a fraud allegation, or (2) when the confidential sources are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged." Nat'l Junior Baseball League, 720 F.Supp.2d at 538. To satisfy this burden, "the complaint must disclose: (1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information." Id. Furthermore, "allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and

describe supporting events in detail." Id.; see Chubb Corp., 394 F.3d at 146.  Where such detail is lacking, courts may discount confidential source allegations.  Avaya, 564 F.3d at 263.

We find that the confidential source allegations proffered in support of the inference that Anadigics was missing orders and the CW's statement that LG and Samsung were double sourcing their orders lack the level of detail necessary to meet the PSLRA's heightened pleading standard, such that the statements attributed to the CWs may be discounted.  While the Second Amended Complaint does detail the positions held by the CWs and the time frame in which they worked at Anadigics, there are no reference to particular dates on which material information was discovered and allegedly conveyed to management that would permit the Court to infer a strong inference of scienter on the part of Defendants at the time the allegedly false and misleading statements were made; rather, Plaintiffs rely on vague references to "hallway conversations" and "daily production meetings" presumably taking place during the Class period.  (2d Am. Compl. at ¶¶ 75-76.) Similarly, allegations by CW1 and CW4 that Anadigics was "having some difficulty meeting firm orders" as of late 2007 and "missing firm orders on a continuous basis" after the Intel yield problem manifested in early 2008 simply do not explain with the requisite particularity which customers were actually not receiving orders,

to what extent, and when Defendants would have become aware of
the alleged missing orders.  As discussed above, in light of the
Complaint as a whole, the most plausible inference to draw from
the allegations is that missed orders, and more importantly the
resultant effect on Anadigics's relationships with its customers
(in light of the high demand for the products in general), would
not have become evident to Anadigics until "the second and third
quarters of 2008."  (2d Am. Compl. at ¶ 105.)

### 2. Bastani's July 22, 2008 Statements that Supply and Demand Were Even

We next consider whether Plaintiffs can establish a strong
inference of scienter with respect to whether Bastani acted with
the requisite state of mind, intent to deceive or recklessness,
in indicating that Anadigics was fully meeting customer demand as
of July 22, 2008.  The PSLRA requires that "with respect to each
act or omission alleged," a plaintiff must "state with
particularity facts giving rise to a strong inference that the
defendant acted with the required state of mind."  15 U.S.C. §
78u-4(b)(2)(A).

Scienter may be established by setting forth facts that
constitute circumstantial evidence of either recklessness or
conscious behavior and supported by evidence of motive and
opportunity to commit fraud.  Advanta, 180 F.3d at 534.  After
Tellabs, however, evidence of motive and opportunity is no longer

78

an independent means of establishing scienter absent evidence of facts from which to infer defendants' knowing deceit or recklessness.  <u>Avaya</u>, 564 F.3d at 276.[10]  To prove scienter by circumstantial evidence, the plaintiff must support his allegations by detailing with particularity the "who, what, when, where and how" of the events at issue and present clear facts verifying plaintiff's deductions with respect to defendant's state of mind.  <u>In re Synchronoss</u>, 705 F.Supp.2d at 400 n.43 (citing <u>In re Burlington Coat Factory</u>, 114 F.3d at 1422).

Weighing the competing plausible inferences, we find that Plaintiffs have not pleaded with the requisite particularity any facts from which to infer that Bastani possessed evidence as of July 22, 2008, that Anadigics was not meeting customer demand at that time, such that his representations that problems meeting demand were a thing of the past and supply and demand had evened out could be said to have been made with the knowledge that they were not accurate.

The CWs' assertions lack any particularized assertions as to what Bastani knew or should have known about manufacturing capacity or customer demand during that time frame.  (<u>See</u> Pls.

---

[10] Examples of motive and opportunity include:  (1) benefitting in a concrete and personal way from the purported fraud; (2) engaging in deliberately illegal behavior; (3) knowledge of facts or access to information suggesting that public statements were not accurate, or (4) failing to check information the defendant had a duty to monitor.  <u>In re Synchronoss</u>, 705 F.Supp.2d at 399.

Opp'n at 74-75.)  For example, Plaintiffs allege that CW1 was a
Senior Vice President of Operations from September 2007 through
August 2008 and "personally communicated with Bastani on a daily
basis" and participated in weekly meetings attended by Bastani
where "fab capacity and customer orders were discussed."  (Id. at
74.)  The Second Amended Complaint makes no representation as to
the status of fab capacity and customer orders as of July 22,
2008, however, except to state that "Bastani had known since
January 2008, when the orders for the via etchers were placed,
that the fab would be capacity constrained until the etchers were
delivered six months later, not accounting for the additional
couple of months needed to make the etchers production ready."
(2d Am. Compl. at ¶ 155.)  This assertion is vague as to timing;
"additional couple of months" does not allow for a "strong
inference" that as of the end of July, Bastani knew that the via
etchers had not been installed and brought online at the fab.

      We also find that Bastani's comment that Anadigics had been
constrained to meet customer demand in the 3G market "was a
comment about the past. . . . like a Q1/Q4 comment.  We have
shipped a lot of the stuff now," does not rise to the level of
recklessness or intent to deceive, but rather comes off as, at
most, careless or negligent.  (Id. at ¶ 154.)  "Recklessness" in
the scienter context means "highly unreasonable conduct,

involving not merely simple, or even inexcusable negligence, but
an extreme departure from the standards of ordinary care. . . .
recklessness is a lesser form of intent rather than a greater
degree of negligence." In re Intelligroup, 527 F.Supp.2d at 282-
83 (citations omitted); see also Avaya, 564 F.3d at 267 n.42.

With respect to Bastani's comment that "in Q2 [2008], demand
and supply were pretty well in balance," Plaintiffs plead no
facts from which to infer the requisite strong inference of
scienter. (2d Am. Compl. at ¶ 156.) Plaintiffs merely allege
that this statement was false and misleading because (1)
"customers had lost faith in Anadigics' ability to fill their
firm orders," (2) Samsung "was no longer using the Company as a
supplier," and (3) "Bastani knew that the Company had lost market
share from its wireless handset customers by this time." (Id. at
¶¶ 157.) Only the last assertion goes to Bastani's mental state.
But if Bastani knew that the Company had lost market share as of
July 22, 2008, and was also predicting weakened demand in the
wireless handset market during that same earnings call, this is
consistent with his statement that supply and demand were now
"pretty well in balance," given that demand had far exceeded
supply before then. Even considering "all of the facts alleged,
taken collectively," we find that this nonculpable explanation
for the statements is cogent and more compelling than the

competing inference that Bastani was motivated to make a misleading statement to make Anadigics look better to investors. See Avaya, 564 F.3d at 267-68.

Plaintiffs' "Core Operations" allegations do not establish scienter, either.  Plaintiffs allege that, according to CW1, "Bastani was in frequent direct contact with the Company's wireless handset customers, and even undertook a 'tour' of the Company's key wireless handset customers in July-August 2008," but this allegation says nothing about what Bastani might have learned as a result of this "tour" or, significantly, whether he learned any material information prior to the date at issue, July 22, 2008.  (2d Am. Compl. at ¶ 185.)

We therefore conclude that while Bastani's statements may have plausibly been demonstrably false based on an acceptance of the inference that not all of the via etchers had yet been brought online at the fab, Plaintiffs simply alleged no facts from which the Court could infer that Bastani acted with the requisite mental state in stating in the July 22, 2008 Earnings Call that supply and demand had evened out.

## C. **Loss Causation**

Plaintiffs allege that "the truth about Anadigics" was revealed in part during the July 22, 2008 Earnings Call, and then in a full disclosure on August 8, 2008.  (2d Am. Compl. at ¶

201.)  However, because we find that Plaintiffs have not established the material misrepresentation or omission element of their securities fraud claim with respect to any representations made before these alleged revelations, we need not reach the parties' contentions regarding whether Plaintiffs adequately pleaded loss causation.  See In re Intelligroup, 527 F.Supp.2d at 334 ("[I]n order to be correctively disclosed--and, thus, provide the basis for the loss causation element--the information needs to be initially misrepresented in order to provide the basis for the transactional causation element.")

## III. **Rule 10b-5(a) and (c) Claim**

Plaintiffs assert a separate claim under Rule 10b-5(a) and (c), asserting that with respect to this claim, "Plaintiffs need not allege . . . nor prove . . . that any of the Defendants made any misrepresentations or omissions of material fact for which they also be liable under Rule 10b-5(b)."  (2d Am. Compl. at ¶ 214.)  However, this claim is unmistakably predicated on the same factual basis as the Rule 10b-5(b) claim--that Defendants allegedly "deceived the investing public" by the "knowing and/or reckless suppression and concealment of information regarding Anadigics' true capacity potential and profitability during the Class Period."  (2d Am. Compl. at ¶¶ 215, 217.)  This is just another formulation of Plaintiffs' assertion that Defendants made

material omissions in failing to disclose that the via etcher and Intel yield problems were affecting Anadigics's ability to meet customer demand.  Accordingly, we find that the analysis above applies to Plaintiffs' Section 10(b) and Rule 10b-5 claims in their entirety, such that both Count I, alleging violation of Rule 10b-5(b), and the alternative theory of liability pleaded in Count II of the Second Amended Complaint must be dismissed.[11] See The Lautenberg Found. V. Madoff, No. 09-816, 2009 WL 2928913, at *12 (D.N.J. Sept. 9, 2009) ("A Rule 10b-5(a) and/or (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim."); see also S.E.C. v. Lucent Techs., Inc., 610 F.Supp.2d 342, 359-61 (D.N.J. 2009).

## IV.  Section 20(a) Claim

Plaintiffs allege that the Individual Defendants, "[b]y virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and otherwise disseminated to the investing public" were "controlling persons" of Anadigics under Section 20(a).  (2d Am. Compl. at ¶ 223.)  However,

---

[11] Plaintiffs' counsel acknowledged to the Court that Count II "relies upon most of the same facts and circumstances and the C.W. testimony to establish scienter. . . . the allegations under (a) and (c) rise and fall with the allegations under the 10[b-5](b)."  (8-3-10 Hr'g Tr. at 90:17-18, 91:6-7.)

Plaintiffs have not pleaded facts adequate to establish that Anadigics is liable under Section 10(b) or Rule 10b-5 with the particularity required by the PSLRA.  Thus, because there can be no liability for the underlying company, there can be no "controlling person" liability under Section 20(a) for either Bastani or Shields.  <u>See</u> <u>In re Suprema Specialties, Inc.</u>, 438 F.3d at 287; <u>Chubb Corp.</u>, 394 F.3d at 159 n.21.

### CONCLUSION

The Court, for the reasons stated <u>supra</u>, will (1) grant the motion, (2) deny the cross motion, and (3) dismiss Plaintiffs' claims with prejudice.[12]  The Court will issue an appropriate order and judgment.

_s/ Mary L. Cooper_____

**MARY L. COOPER**
United States District Judge

Dated:     September 30, 2011

---

[12] We do not believe that Plaintiffs should be given an opportunity to amend the Second Amended Complaint, because it appears that they have already set forth all facts available to them in support of their claims, and have not shown that Defendants are liable under Section 10(b) and Rule 10b-5.  Thus, allowing plaintiffs to replead would be futile since no amendment would satisfy the stringent pleading requirements of Rule 9(b) and the PSLRA.  <u>See</u> <u>In re Alpharma Inc. Sec. Litig.</u>, 372 F.3d 137, 153-54 (3d Cir. 2004).  Thus, dismissal here is with prejudice.